IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY CLARK,

    Plaintiff,                      No. CIV S-10-2863 GGH

    vs.

MICHAEL J. ASTRUE,              ORDER
Commissioner of
Social Security,

    Defendant.
                                          /

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, Plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

        Plaintiff, born July 27, 1963, applied on January 11, 2008 for disability benefits. (Tr. at 52.) Plaintiff alleged he was unable to work since November 1, 2000, due to anxiety, panic attacks, schizophrenia, ADHD, learning problems, and arthralgia in the back, knee, and ankles. (Id. at 52, 97, 101, 12.) In a decision dated August 26, 2009, ALJ Stanley R. Hogg

\\\\\

1

determined plaintiff was not disabled. The ALJ made the following findings:[1]

    1.    The claimant has not engaged in substantial gainful activity since January 11, 2008, the application date (20 CFR 416.971 *et seq.*)

    2.    The claimant has the following severe impairments: anxiety and depressive disorder, schizophrenia, drug and alcohol dependence, in remission, and arthralgias of the back, knee, and ankles (20 CFR 416.920(c)).

    3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

    4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he can lift 25 pounds occasionally and 10 pounds frequently. He is limited to

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

|   |    |   |
|---|----|---|
|   |    | simple, repetitive tasks that do not involve frequent interaction with co-workers, supervisor, and the public or significant changes in work routine. |
|   | 5. | The claimant has no past relevant work (20 CFR 416.965). |
|   | 6. | The claimant was born on July 27, 1963 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed. (20 CFR 416.963). |
|   | 7. | The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964). |
|   | 8. | Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968). |
|   | 9. | Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a). |
|   | 10.| The claimant has not been under a disability, as defined in the Social Security Act, since January 11, 2008, the date the application was filed (20 CFR 416.920(g)). |

(Tr. at 12 - 18.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Erred in Failing to Find that Plaintiff's Mental Impairment Met or Equaled the Requirements of Listing 12.05C; B. Whether the ALJ Failed to Properly Credit Plaintiff's Testimony and Third Party Statements Regarding His Functional Limitations; and C. Whether the ALJ Erred in Failing to Obtain Testimony of a Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v.

3

1  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence
2  as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d
3  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ
4  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving
5  ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).
6  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one
7  rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

A. Listing 12.05C

Plaintiff contends that he meets or equals Listing 12.05C.  The ALJ determined in finding no. 3 of the decision that plaintiff's impairments did not meet or equal an impairment listed in the Regulations' "Listing of Impairments" ("Listings"), which lists impairments to thirteen categories of body systems which are severe enough to preclude any gainful activity. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).  When all the requirements of a listing are met, the described condition is irrebuttably presumed disabling. Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. § 404.1520(d).

At the third step of the disability analysis, the ALJ determines whether a person's condition either "meets" or "equals" a listing.  A mere *diagnosis* of a listed impairment is not sufficient.  Specific findings included in each listing also must be met.  See, e.g., Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985).  Alternatively, other diagnostic tests, or the combined effects of various conditions, may demonstrate the "equivalent" of the specific required findings. See, e.g., Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990). In sum, however, unless an impairment is as severe as and has lasted as long as described in the listing, a person is not presumptively disabled.  Young, 911 F.2d at 183.

\\\\\
\\\\\

4

Listing 12.05 provides in part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[2]
>
> The required level of severity for this disorder is met when the requirements in A, B, C, **or** D are satisfied.
> ...
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work- related limitation of function;
> ...

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(c). (emphasis added).

"An impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Fanning v. Bowen, 827 F.2d 631, 633 (9th Cir. 1987).  This, in other words, is the definition of a "severe" impairment.  Thus, in this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the §12.05C listing. Id.; see also Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997); Edwards v. Heckler, 736 F.2d 625, 629-31 (11th Cir.1984); Nieves v. Secretary of Health & Human Servs., 775 F.2d 12, 14 & n. 7 (1st Cir.1985)).  Indeed, in footnote 3 of the Fanning decision, the court found that the "extra" impairment need not even reach the "severe" limit; although one might be hard pressed to call a less than "severe" impairment, an impairment at all.

In Fanning, the first prong of the listing was met because plaintiff's IQ was found to be between 76 and 69. Fanning, 827 F.2d at 633.  The court imposed a standard applicable to the second prong, that the impairment must have more than a slight or minimal effect on plaintiff's ability to perform basic work activities. Id.  Because the ALJ had not considered this

---

[2] Indeed, in the DSM-IV, in order to be considered mentally retarded, one must exhibit this retardation prior to age 18.  DSM IV-TR at 41.

question in regard to the plaintiff's knee injury, the court remanded the matter. Id.

In the instant case, the ALJ found no severe impairment relating to plaintiff's intellectual functioning. (Tr. at 12.) Instead, the ALJ explained that a comprehensive psychological exam in March, 2008, indicated that plaintiff had a verbal IQ of 75, a performance IQ of 76, and a full scale IQ of 70, referring to psychologist Nakagawa's opinion. (Tr. at 14, 226.) The ALJ focused on this psychologist's opinion that plaintiff might have difficulty doing work that involves reading and writing but could follow simple job instruction. In regard to plaintiff's anxiety disorder, the ALJ cited Ms. Nakagawa's report that plaintiff's ability to interact with others would be negatively affected but that she did not provide specific limitations in this regard. (Id.) He also cited the report notation that plaintiff's overall ability to make social and occupational adjustments was only mildly limited. (Id.)

Ms. Nakagawa diagnosed plaintiff with borderline intellectual functioning, "social anxiety disorder, somewhat stabilized with medication," ADHD, and marijuana abuse.[3] She noted that no physical problems were reported by plaintiff. (Id. at 227.)

The ALJ stated: "[t]here is no diagnosis of mental retardation by the consulting psychologist [Nakagawa] or any other physician and the evidence does not support a finding of mental retardation with deficits in adaptive functioning manifested during the developmental period before age 22. Thus the claimant does not meet or equal Listing 12.05." (Id. at 14.)

First, there is no requirement that plaintiff must be diagnosed with mental retardation in order for this listing to be met, regardless of his IQ scores. A formal diagnosis of mental retardation is not required. Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007); Lewis

---

[3] Although plaintiff's alcohol and methamphetamine abuse have terminated, he admits to continuing marijuana use, which is mentioned a few times in the record and acknowledged by the ALJ. (Tr. at 14, 225.) It is not clear whether plaintiff's marijuana abuse would interfere with his ability to work. However, plaintiff, of course, does not raise the issue as to do so may well preclude benefits on a per se basis. The ALJ has not analyzed the issue. See Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001). Nevertheless, no one raises the drug issue, and the court will not raise it *sua sponte* in this case.

1  v. Astrue, 2008 WL 191415 at * 5 (N.D. Cal. 2008). Therefore, plaintiff's full scale IQ score of

2  70, as found by Ms. Nakagawa, supports a finding that plaintiff met this first prong of subsection

3  (C) of the listing.[4]

4           In regard to a required onset date of age 22, plaintiff urges the court to consider

5  the statement of Ms. Gavin, who evaluated plaintiff's learning disabilities when he was 43 years

6  old to determine his eligibility for ADA accommodations. In finding that he met the criteria for

7  specific learning disabilities, she stated,

> Mr. Clark presents with an extensive childhood history of learning difficulties and special education services. Results of this assessment are indicative of information processing deficits that affect his ability to communicate in reading, writing, listening, speaking, mathematics, and reasoning. These results are not considered the result of physical, cultural, environmental, or economic factors.

12  (Id. at 187.)  Plaintiff also points to his own testimony that he was first put in special education

13  classes in the sixth grade. He further testified that he failed the written driver's license test in

14  West Virginia, and does not have a driver's license. (Id. at 24.)

15           All of what plaintiff refers to as evidence, however, are his own statements and

16  testimony. Although Ms. Gavin stated that she obtained background information from her

17  interview of plaintiff and through submitted records, the transcript herein contains no record of

18  plaintiff's IQ prior to age 22. In fact, this learning disabilities specialist specifically stated that

19  plaintiff was the source of the information in that he "reported that school was always hard for

20  him and that he was in special education classes beginning in sixth grade and continuing through

21  high school." (Id. at 165.) Although lay evidence may be permissible, the date alleged by the

22  plaintiff should be used only when consistent with other available evidence. Social Security

23  Ruling 83-20. "The impact of lay evidence on the decision of onset will be limited to the degree

24  it is not contrary to the medical evidence of record." (Id.) In fact, the same report included a

---

[4] Although plaintiff had other higher IQ scores, the regulations provide that the lowest score is to be used. 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00D.6.c.

7

current IQ test from January, 2007, with a full scale IQ of 85, in the low average range, which the ALJ duly noted. (Id. at 171-72, 14.) The fact that plaintiff may have been enrolled in special education classes does not automatically lead to the conclusion that it was due to borderline intellectual functioning. Furthermore, reliance solely on a claimant's statements without corroboration creates the potential for abuse, especially in this case where the ALJ found plaintiff's statements regarding his psychiatric symptoms could not be fully credited. (Tr. at 17.) At the time plaintiff made these statements, he was represented by counsel and his attorney had the opportunity to submit evidence of mental retardation prior to age 22. (Tr. at 20.) Counsel failed to do so. Plaintiff has submitted no other evidence of his onset date, such as school records, report cards, or even psychologist's reports, let alone medical records, and therefore has not met his burden. Without evidence of onset prior to age 22, listing 12.05 can not be satisfied.

Although other circuits have found a rebuttable presumption that a plaintiff's IQ prior to age 22 was the same as his current IQ, the Ninth Circuit has not decided this issue, nor has it expressed what criteria would satisfy this age requirement. Walberg v. Astrue, 2009 WL 1763295 (W.D. Wash. 2009) (citing cases). In any event, those circuits permitting such a rebuttable presumption only apply it where there are no intervening circumstances which might possibly have affected an IQ. Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985) (rebuttable presumption absent contrary evidence); Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001) (rebuttable presumption unless change in intellectual functioning). Plaintiff reported to Ms. Gavin that when he was twenty years old, he suffered a head injury in a motorcycle accident; however, the nexus between IQ immediately after the accident and before age 22, and this motorcycle accident cannot be found without exercising the sheerest of speculation.

In the Eastern District of California, courts are not adopting the presumption. Rhein v. Astrue, 2010 WL 4877796 (E.D. Cal. Nov. 23, 2010) (finding rebuttable presumption would remove plaintiff's burden at step three); Campbell v. Astrue, 2011 WL 444783 (E.D. Cal. Feb. 8, 2011) (finding rebuttable presumption persuasive but nevertheless relying on evidence in

record to support onset prior to age 22). The undersigned also declines to find a rebuttable presumption especially in a situation where there are glaring discrepancies in the IQ scores in the first place.[5] Without meaningful evidence of onset prior to age 22, listing 12.05 can not be satisfied.

B. Whether the ALJ Failed to Properly Credit Plaintiff's Testimony and Third Party Statements Regarding His Functional Limitations

1. Plaintiff's Testimony

Plaintiff contends that the ALJ rejected his credibility without clear and convincing reasons.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. July 8, 2009); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See Vasquez, 572 F.3d at 591. The ALJ also may consider the applicant's: (1)

---

[5] It is one thing to use the lowest IQ score to commence the Listing Analysis at the first prong; it is quite another to ignore inconsistent evidence of low IQ for purposes of determining whether a low IQ existed before age 22. Moreover, with a life long history of drug abuse, one can validly question whether the lower score was performed on a drug clouded day.

9

reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[6] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom." Vasquez, 572 F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d at 1282). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be specific, clear and convincing. Vasquez, 572 F.3d at 591.

Plaintiff's credibility was properly questioned for the reasons pointed out by the ALJ.[7] He first noted that although plaintiff claimed disability since 2000, he admitted in January, 2006 that he had not worked in the previous five years because he had been taking care of his disabled child. (Tr. at 14.) The ALJ also noted plaintiff's report in May, 2007, that medication was very much helping his anxiety and that Paxil had changed his life. (Id., tr. at 205, 207[8].) In

---

[6] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

[7] Plaintiff has limited this issue to the ALJ's determination regarding his mental capacity, not his physical capacity. Therefore, the credibility analysis will not touch on plaintiff's joint pain.

[8] Plaintiff reported to Sacramento County Mental Health on March 13, 2007, that his anxiety was a lot better, that he now sees the glass as 3/4 full, and that Paxil saved his life.

10

1 fact, plaintiff reported that medication had improved his ability to focus and concentrate. (Id. at
2 14.) He also experienced no side effects. (Id. at 17.) The ALJ also discussed plaintiff's mental
3 state from the point of view of examining sources, noting that Ms. Nakagawa, a consulting
4 psychologist, opined that plaintiff could complete simple job instructions, and that he was only
5 mildly limited in ability to make social and occupational adjustments.[9] (Id. at 14, 227.) The ALJ
6 also summarized plaintiff's treating sources at Northgate Point, who found that plaintiff's
7 depression was reactive and related to his financial difficulties. (Id. at 14, 287.) Furthermore,
8 the ALJ added that treating records at Sacramento County Mental Health indicated that plaintiff
9 was seen there only for purposes of monitoring his medication, and these records did not show
10 any serious objective findings. (Id. at 17.) The records support this summary. See Id. at 205
11 (social anxiety disorder responded very well to Paxil), 207 (plaintiff stated that Paxil saved his
12 life, and anxiety a lot better; cognition was intact and insight and judgment were good), 211
13 (plaintiff stated he felt more confident with Paxil and he couldn't believe how different he felt;
14 his son stated that he had his daddy back), 227 (plaintiff began receiving medication for ADHD),
15 255 (plaintiff reported doing better overall despite diagnoses of major depression, recurrent,
16 mild, and ADHD; mood and attention were improved), 285 (medication helped to decrease
17 hallucinations and nightmares, helped with sleep, and helped manage his mood; plaintiff could
18 smile and joke appropriately at appointment and was more optimistic), 286 (Ritalin helped with
19 focus and concentration), 289 (Ritalin discontinued because it was exacerbating symptoms;
20 instead plaintiff's dose of Seroquel was increased to treat schizophrenia), 297(plaintiff denied
21 ever trying to hurt himself or having suicidal thoughts).
22 \\\\\

---

[9] Ms. Nakagawa did not make the latter finding regarding social and occupation adjustments; rather the ALJ may have been referring to the psychiatric review technique form or the mental RFC assessment completed by non-examining psychologist Fuller. (Tr. at 229-246.) Ms. Fuller concluded that in addition to being able to carry out simple job instructions, plaintiff could do simple work that did not require him to be in close contact with the general public or near other coworkers. (Id. at 245.)

The ALJ also discussed plaintiff's daily activities which included chores in the house, odd jobs, caring for chickens and selling eggs, riding his bicycle, and attending appointments. (Tr. at 14, 16.) The ALJ did note plaintiff's expression of some anxiety, difficulty in large crowds, and some auditory hallucinations. (Id. at 14.) Plaintiff's report to treating sources at Turning Point confirmed these activities, but he was able to go to doctor's appointments and the grocery store despite his social limitations. (Id. at 255.) Plaintiff also cared for a disabled child during the time period he alleged disability. (Id. at 164, 199.)

Adding to the ALJ's doubts about plaintiff's credibility was the fact that plaintiff continued to abuse marijuana, to the extent that Ms. Nakagawa thought plaintiff was not capable of managing his own funds, and his treating sources opined that he possibly abused it on a daily basis. (Id. at 16, 227, 202.) Additionally, plaintiff testified at hearing that he smokes marijuana only twice a month when he goes fishing; however, he reported to Ms. Nakagawa that he smokes it "twice a week or so." (Id. at 29, 225.) He reported to Ms. Gavin that as of January, 2007, he had been substance free for three months. (Id. at 165.) In October, 2006, he was diagnosed with marijuana dependence, and the treating source thought plaintiff was abusing it, "possibly on a daily basis." (Id. at 202.)

Furthermore, the ALJ made note of the lack of aggressive therapy, finding it to have been only routine and conservative in nature. (Id. at 17.) Furthermore, none of the examinations indicated any serious objective findings or reflected a serious impairment in memory, concentration or attention. (Id.) The ALJ did separately note plaintiff's diagnosis of schizophrenia by Northgate Point, as well as the treating notation that plaintiff was in a stable social situation. (Id. at 15, 285.) No other mental health practitioner diagnosed plaintiff with schizophrenia.[10] (Tr. at 227, 202, 252.) The ALJ concluded that although the record clearly indicated some psychiatric symptoms, they were not disabling in nature. (Id. at 17.)

---

[10] Auditory hallucinations are also associated with chronic long term use of methamphetamine. www.kci.org.

Furthermore, as noted by defendant, although Ms. Nakagawa found plaintiff's full scale IQ to be 70, Ms. Gavin's tests found IQs in the low average to average range, from 80 to 90.[11]  (Id. at 171-72.)  It is true, as plaintiff suggests, that plaintiff's current mental testing indicates a weak working memory and very weak processing speed profiles, which, according to Ms. Gavin, "impose substantial limitations on measures requiring focused attention, concentration, and speed, and may minimize overall scores of intelligence."  For this reason, Ms. Gavin explained that plaintiff's full scale IQ is less meaningful in his case because there were significant differences between his verbal and performance scores due to his aforementioned disabilities.[12]  (Tr. at 172.)  Although these limitations may be pertinent to the discussion of what kind of work plaintiff can do, *infra*, the ALJ did not err in noting the discrepancies outlined here to find plaintiff not completely credible.  The ALJ gave clear and convincing reasons in support of his credibility analysis, which is supported by the record.

### 2. Third Party Testimony

Plaintiff also asserts that the ALJ did not properly consider the lay opinion of Craig Smith, plaintiff's friend and landlord, who testified regarding plaintiff's behavior and functional limitations.

An ALJ is required to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work."  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role

---

[11] The case analysis done by the non-examining psychologist questioned the ten point difference between the IQ scores and therefore plaintiff's credibility.  (Id. at 271.)

[12] Although there is no evidence in the record, one wonders whether plaintiff had smoked marijuana on the day of this testing or any other testing.

in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The Ninth Circuit has held that the ALJ must properly discuss lay witness testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully crediting the testimony, could have come to a different disability determination. Stout v. Commissioner, 454 F.3d 1050 (9th Cir. 2006). This standard is extremely high and rivals, if not surpasses, the Chapman harmless error standard in criminal law (error harmless only if no reasonable doubt about its lack of effect).

Plaintiff objects to the ALJ's consideration of this testimony, arguing that his reasons for rejecting it were not specific or germane. Here, the ALJ described Mr. Smith's testimony:

> The claimant's friend and landlord, Craig Smith also appeared at the hearing and indicated that the claimant has lived on his property for 6 years. He stated that he has noticed that the claimant has become increasingly confused during the past 5 years, as the claimant has difficulty following direction. Mr. Smith stated that the claimant appears lethargic and avoids large groups of people.

(Tr. at 16.) Nevertheless, the ALJ found that Mr. Smith's statements did not support a finding of disability and were inconsistent with the ALJ's conclusion that plaintiff was not entirely credible and that his psychiatric symptoms, although not totally without merit, were not disabling. (Id. at 17.) The ALJ rejected this lay witness testimony for the same reasons that he discounted plaintiff's credibility. (Id.) See discussion supra. Because his reasons applied equally to plaintiff and to Mr. Smith, he was not required to repeat each reason separately. The undersigned has already found that these reasons are clear and convincing and supported by substantial evidence. An ALJ may reject third party testimony for the same reasons that plaintiff's credibility is discounted where the lay witness testimony is similar to plaintiff's testimony and

the ALJ had given clear and convincing reasons to discount plaintiff's testimony, thereby constituting germane reasons for rejecting the lay witness testimony. Valentine v. Commissioner, 574 F.3d 685, 694 (9th Cir. 2009). Therefore, the ALJ properly discounted Mr. Smith's lay testimony.

    C. Whether the ALJ Erred in Utilizing the Grids Instead of a Vocational Expert

Plaintiff contends that the ALJ should have utilized a vocational expert due to his severe mental impairments and functional limitations, including memory problems, difficulties in concentration, persistence, and pace, impairment in relating to other people in the workplace, and being inconsistent in dealing with routines and changes in work routines.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience. At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional capabilities.[13] Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc). The ALJ, however, is not automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional limitation. Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, §

---

[13] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989). Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

200.00(e)(2) (1996). The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional limitation significantly limits plaintiff's ability to work in a certain category. Desrosiers 846 F.2d at 578 (Pregerson, J., concurring). "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines. In such a case, the guidelines would be inapplicable." Desrosiers, 846 F.2d at 577-78. The ALJ is then required to use a vocational expert, Aukland v. Massanari, 257 F. 3d. 1033 (9th Cir. 2001).

Here, the ALJ found that plaintiff could do simple unskilled work that did not require frequent interaction with others or significant changes in work routine, that these limitations would have no impact on the occupational base for light work, and therefore plaintiff could do the full range of light work under the grids. (Id. at 18.)

Unskilled work includes the ability to understand, carry out and remember simple instructions. SSR 85-15. This ruling states:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

Such jobs "ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." Id. Unskilled work involves little or no judgement to do simple duties that can be learned on the job in a short period of time. This is in contrast to semi-skilled or skilled work which may require alertness, close attention, or coordination and dexterity to do repetitive tasks quickly. 20 C.F.R. § 404.1568. The ALJ's limitations correspond to plaintiff's limitations in following simple instructions and little contact with others.

\\\\\

1                 Plaintiff cites to Program Operations Manual System at DI 25020.010 for the
2  proposition that certain mental abilities are critical in performing unskilled work, including the
3  abilities to "understand, carry out, and remember simple instructions; make judgments that are
4  commensurate with the functions of unskilled work; respond appropriately to supervision,
5  coworkers and work situations; and deal with changes in a routine worksetting."  Also included
6  are the abilities to maintain regular attendance and punctuality, and to complete a normal
7  workday and workweek without interruption.  The Ninth Circuit in Hoopai v. Astrue, 499 F.3d
8  1071, 1077 (9th Cir. 2007) has held that moderate limitations in these abilities are not
9  sufficiently severe non-exertional limitations to warrant departure from the grids.  The plaintiff in
10 that case was moderately limited in his ability to maintain attention, concentration, persistence
11 and pace, as is the plaintiff in this case.  In fact, plaintiff here is not significantly limited in
12 maintaining regular attendance or performing at a consistent pace, and in being able "to complete
13 a normal workday and workweek without interruption from psychologically-based symptoms,"
14 as was the plaintiff in Hoopai.  (Id. at 243, 244.)  The court held that moderate limitations in
15 these categories would not significantly limit plaintiff's ability such that vocational testimony
16 was required.  Id.  As plaintiff in this case does not have some of the moderate limitations that
17 the plaintiff in Hoopai had, there is even more reason not to depart from the grids in this case.

18                 Ms. Nakagawa found that plaintiff could complete simple job instructions.  (Id. at
19 227.)  The non-examining psychologist found that plaintiff had the persistence and pace to be
20 able to do simple work, and his adaptation skills were sufficient for simple work.  (Tr. at 245).
21 Plaintiff could also understand, remember and carry out very short and simple instructions.  (Id.
22 at 243.)  Plaintiff was also found to be able to respond appropriately to changes in the work
23 setting.  (Id. at 244.)  Despite this psychologist's finding that plaintiff could not work in close
24 contact with the general public or near other coworkers, (id. at 245), light work involves dealing
25 with objects rather than people.  SSR 85-15.  Updated case analysis from July, 2008, affirmed
26 these findings.  (Id. at 271.)  Although Sacramento County Mental Health records suggested that


Case 2:10-cv-02863-GGH   Document 28   Filed 02/08/12   Page 18 of 18

plaintiff was seriously limited in his ability to make social and occupational adjustments, the ALJ rejected this conclusion because related treating notes did not contain objective findings to support this conclusion and plaintiff was usually seen at this clinic only to monitor his medication. (Id. at 15, 17.) Plaintiff does not contest this finding. Therefore, according to Hoopai, moderate limitations in these abilities are not sufficiently severe non-exertional limitations to warrant departure from the grids.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is entered for the Commissioner.

DATED: February 7, 2012

                                                                /s/ Gregory G. Hollows  
                                            UNITED STATES MAGISTRATE JUDGE

GGH/076/Clark2863.ss.wpd